# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0532-MR

ANTONIO LEE THOMAS RAY                                                     APPELLANT

V.
ON APPEAL FROM WARREN CIRCUIT COURT
HONORABLE STEVE ALAN WILSON, JUDGE
NO. 20-CR-00188

COMMONWEALTH OF KENTUCKY                                                  APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Warren Circuit Court jury found Antonio Lee Thomas Ray guilty of first-degree robbery, second-degree robbery, and of being a first-degree persistent felony offender. The trial court sentenced Ray to thirty-five years in prison in accordance with the jury's recommendation. Ray raises several issues on appeal, including that the trial court erred by (1) failing to instruct the jury on the lesser-included offense of theft by unlawful taking for the July 2019 incident; (2) denying his motion to suppress the statement he made to police; and (3) denying his motion for directed verdicts as to both robberies. After careful review, we affirm the judgment of the Warren Circuit Court.

## FACTS AND PROCEDURAL HISTORY

Antonio Lee Thomas Ray was convicted of two robbery incidents at two separate Family Dollar stores in Bowling Green, Kentucky. On July 7, 2019, Ray entered the Family Dollar store on Gordon Avenue at closing time. Jenny Barnett was working as the assistant manager that night and was training a new assistant manager. Ray walked in the store with his shirt pulled halfway up over his face and yelled "Robbery! Robbery!" as he jumped over the counter and approached Barnett. Barnett opened the cash register and gave Ray the available cash. Ray pushed something metal into Barnett's back and said he wanted more money. Barnett believed he had a gun. Barnett then lifted the till of the drawer and gave Ray the cash underneath it. Ray then jumped over the counter again and fled the store with approximately $400 in cash.

During trial, Barnett admitted that she did not see a gun and was not sure that Ray had one, but that she believed he did at the time. Although Barnett was unable to identify Ray, Ray admitted to committing the robbery during his December 6 interview. During that confession, Ray told officers there were two women in the store that night and described in detail the route he took to enter and exit the store. He explained that the worst part was that a drug dealer took the money from him, so he ended up with nothing. Ray did not recall implying that he had a gun.

On November 14, 2019, Miesha Whitney-Patton was the assistant manager working at a different Family Dollar store in Bowling Green. At trial, she testified that as she was closing the store, she heard a knock at the door.

2

In the courtroom she identified Ray as the man she saw standing at the door. She testified that Ray came in the store wanting to purchase a drink, but he had insufficient funds on his card. He then attempted to obtain cash at the ATM but as there was no money on the card, he was unable to obtain cash and left the store. Whitney-Patton remembered Ray from this incident.

Sue Anna Boyd was working as the assistant manager at the same Family Dollar store on November 16, 2019, when a man came into the store and came behind the counter. Boyd testified that the man showed her a closed knife and demanded cash. She told him that she could not open the cash drawer without him making a purchase, so he appeared to look for something to buy and his wallet. Seemingly frustrated, he left the store and Boyd called 911. During the 911 call, Boyd described the man as a "tall black man" wearing a gray jacket with the strings pulled so tight that you could not see his face well. The surveillance video of this interaction was played for the jury.

Although Whitney-Patton, the assistant manager who observed Ray in the store previously, was not present on November 16 when the robbery occurred, she watched the video surveillance from the event and identified Ray based on his clothing. Ray was wearing the same clothing on November 16 that he wore during their encounter on November 14, even including his shoes – black and red Nike shoes with white soles. In addition, approximately one and one-half hours after the November 16 robbery, Officer Devin Mitchell stopped a vehicle driven by a female, and Ray was in the passenger seat. The dash camera video from that encounter showed Ray exiting the vehicle and

3

walking around the back to the driver's side (after it was discovered that the driver's license was suspended and officers told Ray he would need to drive). In the video, Ray is seen wearing the same black tennis shoes with the white soles.

Detective Sean Johnson was assigned to investigate the November 2019 incident. After reviewing the surveillance footage and interviewing Whitney-Patton, Detective Johnson, another detective, and two patrol officers approached Ray at his last known address. Detectives advised Ray that his name had come up during an investigation and they wanted to speak with him. Although the detectives informed Ray he was not in custody, they advised him of his *Miranda*[1] rights before asking him any investigative questions. The encounter was captured by body camera and after a brief exchange, Ray stated he was going to contact an attorney. Detectives asked if he had an attorney and Ray said "no," but that he was going to get one that day. Ray retreated into the residence and the officers returned to their vehicles. After a short amount of time had passed, the officers determined they had probable cause and arrested Ray. Ray immediately asked the officers to talk, but Detective Johnson told Ray that since he requested an attorney, they could no longer speak to him. Ray then claimed that he did not actually ask for a lawyer but only stated that he could get a lawyer.

At the beginning of the interview at the police station, Detective Johnson again questioned Ray about having previously requested a lawyer and not

---

[1] *Miranda v. Arizona,* 384 U.S. 436 (1966).

wanting to talk. Ray acknowledged that he was being recorded, and said he wanted to talk. Ray was again advised of his *Miranda* rights and proceeded to make a statement. During the interview, Ray admitted to committing the July and November robberies. Ray's interview at the police station was played for the jury.

At trial, Ray testified and denied having committed either robbery. He explained that it would have been physically impossible for him to jump the counter as the robber had done during the July 2019 incident because of an injury to his leg and even showed the jury a scar from the surgery. Ray also explained that although he initially denied involvement in the incidents when speaking with police, he felt pressured and thought the only way to get out of the police station was to tell the police what they wanted to hear.

Following a two-day jury trial, Ray was convicted of first-degree robbery for the November 2019 incident, second-degree robbery for the July 2019 incident, and for being a first-degree persistent felony offender. He was sentenced to thirty-five years in prison in accordance with the jury's recommendation. Ray now appeals as a matter of right.

## ANALYSIS

On appeal, Ray argues that the trial court erred by (1) failing to instruct the jury on the lesser-included offense of theft by unlawful taking for the July 2019 incident; (2) denying his motion to suppress the statement he made to police; and (3) denying his motion for directed verdicts as to both robberies. We address each issue in turn, developing additional facts as necessary.

5

**I.     The trial court properly declined to instruct the jury on the lesser-included offense of theft by unlawful taking for the July 2019 incident.**

Ray argues that the trial court erred in refusing to instruct the jury on theft by unlawful taking as a lesser-included offense to second-degree robbery for the July 2019 incident. Ray was charged with first-degree robbery and the trial court agreed to provide a second-degree robbery instruction. He was ultimately convicted of second-degree robbery.

Under Rule of Criminal Procedure (RCr) 9.54(1), "it is the duty of the trial court in a criminal case to instruct the jury on the whole law of the case[.]" *Thomas v. Commonwealth,* 170 S.W.3d 343, 348-49 (Ky. 2005). When a trial court declines to give an instruction on a specific claim, the decision is reviewed for an abuse of discretion. *Sargent v. Shaffer*, 467 S.W.3d 198, 204 (Ky. 2015), *overruled on other grounds by Univ. Med. Ctr., Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021). On appellate review, we must determine whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). Trial courts must give a lesser included offense instruction "if, but only if, 'considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense.'" *Jenkins v. Commonwealth*, 496 S.W.3d 435, 449 (Ky. 2016) (quoting *Commonwealth v. Swift*, 237 S.W.3d 193, 195 (Ky. 2007)).

A person is guilty of second-degree robbery, a Class C felony, "when, in the course of committing theft, he or she uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft." Kentucky Revised Statute (KRS) 515.030(1). In contrast, "a person is guilty of theft by unlawful taking or disposition when he or she unlawfully: (a) Takes or exercises control over movable property of another with intent to deprive him or her thereof[.]" KRS 514.030(1)(a). Theft by unlawful taking is a Class B misdemeanor. Ray maintains that he was entitled to the theft by unlawful taking instruction because the jury could have reasonably believed he did not imply the possession of a weapon or the threat of force.

Barnett, the assistant manager working at Family Dollar during the July 2019 incident, testified that Ray put something she thought was heavy metal on her back as he demanded more money and that she thought the object was a gun. When asked if she was scared, she answered "yes." During her call to 911, Barnett stated that she did not know if it was a gun or not and acknowledged on cross-examination that she had doubts as to whether the object was a gun.

Ray asks this Court to follow *Swain v. Commonwealth,* 887 S.W.2d 346 (Ky. 1994). In that case, Swain was charged with committing a string of robberies at convenience stores. *Id.* at 347. Only one of the robbery victims actually saw a weapon during the commission of the crime, and on one other occasion, Swain said he had a gun and demanded money. *Id.* However, on the three remaining occasions, Swain did not reveal or refer to any weapon and

7

only demanded money while keeping his hands in his pockets. *Id.* Swain was convicted of first-degree robbery for each of the incidents. *Id.*

Swain argued the trial court should have instructed the jury on second-degree robbery. *Id.* The Court held that for the count in which Swain merely stated he had a gun, but never revealed it, the trial court should have given a second-degree robbery instruction because it would not have been unreasonable for the jury to believe Swain did not have a gun. *Id.* As to the counts in which no weapon was seen or mentioned, but Swain merely demanded money while having at least one hand inside his clothing, the jury should have been instructed on second-degree robbery and theft by unlawful taking. *Id.* at 348. The Court reasoned that "[a]s to robbery in the second degree, the facts presented here are sufficient to constitute . . . theft by unlawful taking if [the jury] believes there was no threat of physical force." *Id.*

Therefore, when Swain merely stated he had a gun, but never revealed it, the jury should have been instructed on second-degree robbery. However, when no gun was revealed and Swain did not imply he had a gun, Swain was entitled to a second-degree robbery instruction and a theft by unlawful taking instruction. During the July 2019 robbery, Ray certainly implied he had a gun or some type of instrument by pressing something Barnett described as feeling like heavy metal into her back while demanding more money from the cash register.

In *Tunstull v. Commonwealth,* 337 S.W.3d 576, 583 (Ky. 2011), the defendant committed five bank robberies without ever brandishing a weapon.

8

However, he was masked, ran into the banks, and demanded money. *Id.* at 580-81. Although he argued he was entitled to theft instructions since he had no weapon and did not verbally threaten any action for failing to comply with his demands, the Court disagreed. *Id.* at 583. "A threat does not have to be actual words, but can be communicated by conduct or a combination thereof." *Id.* "As recognized previously, a person rushing into a bank, wearing a ski mask or otherwise disguised, and aggressively demanding money, carries with it an implied threat of physical force against the person(s) from whom the money is demanded if they do not comply." *Id.* The Court concluded that "no reasonable juror could conclude, as to any of the incidents, that Appellant was not guilty of second-degree robbery, yet guilty of theft." *Id.*

This same rationale applies to Ray's case. Even if he did not have a weapon, despite Barnett's testimony that Ray pressed something heavy metal into her back, Ray rushing into the store, yelling "robbery," jumping over the counter, and demanding money while concealing his face to some degree was sufficient to imply a threat of physical force if Barnett failed to comply. Further, Ray's actions had the intended effect because Barnett testified that she was afraid and believed Ray had a gun. Ray used some type of weapon or instrument that he pressed into Barnett's back as he demanded she give him more money from the cash register. In short, based on totality of the evidence, there was no reasonable doubt as to Ray's guilt of second-degree robbery and therefore the trial court's denial of Ray's request to instruct the jury on theft by

9

unlawful taking was not "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

## II. The trial court properly denied Ray's motion to suppress his statement to police.

Next Ray argues his statement to police should have been suppressed. Defense counsel made a motion to suppress the statement, arguing that after Ray invoked his right to counsel the police officers continued to question him regarding the location of his cell phone. Ray argued that pursuant to *Edwards v. Arizona*, 451 U.S. 477 (1981), the officers were required to cease all questioning once Ray invoked his right to counsel.

During the hearing on Ray's motion to suppress, defense counsel acknowledged that testimony was unnecessary because the body camera footage of Ray's interactions with the police officers would suffice. The Commonwealth played the footage for the trial court's review. Officers went to Ray's residence and asked Ray if he would go to the police station to discuss a matter they were investigating. Detective Johnson explained to Ray that he was not under arrest nor was he obligated to go to the station. Even though Ray was not in custody at that time, Detective Johnson advised him of his *Miranda* rights before asking any investigative questions. Then Ray agreed to answer some questions and Detective Johnson questioned Ray as to his whereabouts during the robberies. According to the trial court, when some of the details Ray provided were challenged by the officers, Ray became agitated. Ray said, "I don't want to talk anymore," and "I'm going to contact a lawyer."

10

The officer asked whether Ray had an attorney, and Ray responded "no, but I will today."

After Ray's statement, Detective Johnson provided Ray with his contact information and asked if there was a phone number where Ray could be reached. Ray said he did not know, and said he was going to throw his phone away. When Detective Johnson asked why he would throw the phone away, Ray expressed that he did not want the investigators to know the phone number or the phone's contents. The officers returned to their vehicles and Ray went back inside the house. The officers then determined they had probable cause and arrested Ray.

The audio of the body camera footage of the arrest as played in the court room is difficult to hear at times, but in its Order the trial court described that Ray insisted he never said he did not want to speak with investigators and continued to insist he wanted to talk to them. Detective Johnson made it clear that he could not ask Ray any more questions because he invoked his right to remain silent. However, according to the trial court Ray "repeatedly re-engaged with Detective Johnson and told him that he would like to talk with him about the robbery allegations." It sounds like Ray said, "I never said I was going to get an attorney, I didn't do nothing."

The officer then asked Ray where his phone was and referenced Ray's earlier statement that he was going to get rid of his phone, while also referencing a potential tampering charge. Eventually officers secured Ray's phone. Once he was in an interview room at the police station, Ray looked at

11

the camera, acknowledged that he was being recorded, and stated he wanted to talk. Detective Johnson told Ray he was going to read his *Miranda* rights once more and then Ray could decide if he wanted to talk. Ray decided to talk, and over the course of the next four hours, confessed to the July and November 2019 Family Dollar robberies.

After the hearing, the trial court denied the motion. In a thorough written order, the trial court noted that while Ray initially mentioned an attorney, and therefore invoked his *Miranda* rights, he then continued to engage with investigators and "persistently insisted" that he wished to speak with them. Therefore, the statements made during the custodial interview were not the product of coercion, were knowingly and voluntarily made, and were not in violation of the defendant's right to counsel or right to remain silent. While officers have an obligation to honor a defendant's invocation of the right to remain silent or right to counsel, a suspect that has invoked those rights also has the agency and authority to re-initiate contact with police and may provide a voluntary statement to police after invoking his *Miranda* rights. In the Order, the trial court noted that when Detective Johnson arrested Ray, he told Ray he tried to talk to him and now they could not talk. The court cautioned that this statement "had the potential to convey the message that the defendant was being arrested because he had chosen to invoke his right to remain silent" and that such connotation must be avoided.

This issue is properly preserved by Ray's motion to suppress his statement. "When reviewing a trial court's denial of a motion to suppress, we

12

utilize a clear error standard of review for factual findings . . . ." *Jackson v. Commonwealth,* 187 S.W.3d 300, 305 (Ky. 2006). "A finding of fact is clearly erroneous if it is not supported by substantial evidence; that is, evidence sufficient to induce conviction in the mind of a reasonable person." *Turley v. Commonwealth,* 399 S.W.3d 412, 418 (Ky. 2013) (citing *Moore v. Asante,* 110 S.W.3d 336, 354 (Ky. 2003)). In reviewing the findings of facts, we must "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Commonwealth v. Ousley,* 393 S.W.3d 15, 22 (Ky. 2013) (quoting *Roberson v. Commonwealth,* 185 S.W.3d 634, 637 (Ky. 2006)). If a trial court's factual findings are supported by substantial evidence, "we then conduct a *de novo* review of the court's application of the law to the facts." *Turley,* 399 S.W.3d at 417.

Once Ray was arrested, he asked the officers if they could stop. Detective Johnson responded, "you said you didn't want to talk." So, Ray argues that Detective Johnson's behavior communicated that Ray's request for an attorney was being ignored and therefore Ray acquiesced from that point on. Ray further argues that although he waived his *Miranda* rights at the beginning of the police station interview, that waiver was tainted by Ray's initial treatment by officers and initial *Miranda* violation.

The trial court's findings of fact are clearly supported by substantial evidence because all the findings were derived directly from the body camera footage of Ray's interactions and communications with officers. Therefore, we

13

must determine whether the trial court properly applied the law to the facts. *Id.*

When a defendant invokes his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards,* 451 U.S. at 484-85. We apply *Smith v. Commonwealth,* 920 S.W.2d 514, 517 (Ky. 1995), which adopted a two-part test as explained by the U.S. Supreme Court in *Smith v. Illinois,* 469 U.S 91 (1984). The two-prong test asks "(1) [w]hether the accused clearly invoked his right to counsel, and (2) [w]hether the accused voluntarily '(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.'" *Smith,* 920 S.W.2d at 517 (quoting *Smith v. Illinois,* 469 U.S. at 95).

After some consensual conversation, Ray told officers he did not want to talk anymore and that he was going to contact his attorney. These two statements, when paired together, constitute an unambiguous request for counsel and therefore an invocation of his *Miranda* rights. However, Ray then waived his right to remain silent or to only communicate through counsel when he engaged in further communication with the police. Before Detective Johnson would agree to talk to Ray at the police station, Ray, on video, knowingly and intelligently waived the right he previously invoked. Further, as the trial court described in its order, while he was being arrested, Ray insisted he wanted to talk with the officers.

14

We do not believe Detective Johnson's comments or behavior communicated to Ray that his request for an attorney was being ignored, nor that Ray was being arrested because he invoked his right to counsel. During the actual arrest, Detective Johnson explained that he could not talk to Ray because he had requested a lawyer. There is no indication in the record that Ray interpreted his arrest to be a result of invoking his rights. Further, Ray's statements indicated his knowledge and general awareness of his right to counsel and right to remain silent. So we are also unpersuaded that Ray's subsequent waiver at the police station was in some way caused by his initial interactions with officers. In sum, although Ray invoked his rights early into his conversation with officers, he ultimately waived his rights, re-engaged with Detective Johnson, and proceeded to discuss the incidents with police. As the trial court noted, Ray

> voiced his consternation with the investigators and insisted that he had never said he didn't want to speak with investigators. The defendant continued, unprompted to insist that he wanted to speak with investigators. Detective Johnson made clear that he could not ask the defendant any more questions because he had invoked his right to remain silent and to an attorney. The defendant, however, repeatedly re-engaged with Detective Johnson and told him that he would like to talk to him about the robbery allegations.

Ray's statement at the police station was unequivocal. He said "it's on camera. I want to talk." This is a clear and unambiguous waiver of his *Miranda* rights and therefore the trial court did not err in denying Ray's motion to suppress his statement to police.

15

### III. The trial court properly denied Ray's motion for directed verdicts as to both robberies.

Finally, Ray argues he was entitled to directed verdicts for both the July 2019 and November 2019 incidents. The parties dispute whether this issue is preserved for review. Ray moved for directed verdicts at the close of the Commonwealth's case and argued that the Commonwealth failed to establish venue. Ray renewed the motion at the close of all evidence, arguing the same grounds and generally that there was "insufficient evidence."

In *Ray v. Commonwealth,* 611 S.W.3d 250, 266 (Ky. 2020), this Court explicitly delineated the requirements for preserving a directed verdict issue for appeal:

> [W]e now hold that in order to preserve an alleged directed verdict issue for appeal, criminal defendants must: (1) move for a directed verdict at the close of the Commonwealth's evidence; (2) renew the same directed verdict motion at the close of all the evidence, unless the defendant does not present any evidence; and **identify the particular charge the Commonwealth failed to prove, and must identify the particular elements of that charge the Commonwealth failed to prove.** Criminal defendants may move for directed verdict on one count of a multiple count indictment without rendering the alleged error unpreserved; defendants are not required to move for directed verdict on any lesser included offenses to a particular charge in order to preserve the issue; and, nor are they required to object to instructing the jury on that particular charge to preserve the alleged directed verdict error.

(Emphasis added). Here, Ray moved for a directed verdict at the close of the Commonwealth's case and at the close of all evidence, as required. However, he merely made a generalized argument that there was insufficient evidence. Ray did not provide any further detail or explanation as to which specific elements the Commonwealth failed to prove. As such, and based on the clear

16

and concise rule set forth in *Ray,* his motion for directed verdicts was insufficient to preserve this issue for appellate review.

In the alternative, Ray requests palpable error review. "A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." RCr 10.26. The error must be "so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006). "A palpable error must be so grave that, if uncorrected, it would seriously affect the fairness of the proceedings." *Davis v. Commonwealth*, 620 S.W.3d 16, 30 (Ky. 2021) (citing *Ernst v. Commonwealth,* 160 S.W.3d 744, 758 (Ky. 2005)).

> When presented with a motion for a directed verdict,
>
> the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991). On appeal, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Woods,*

17

657 S.W.3d 902, 906 (Ky. 2022) (quoting *Potts v. Commonwealth,* 172 S.W.3d 345, 349 (Ky. 2005)).

Ray argues that none of the store employees present during the incidents identified him, and these witnesses were not asked to make identifications in the courtroom. But the Commonwealth presented surveillance videos from both robberies alongside testimony of the victims. Both store assistant managers testified about the incidents. In addition, although Whitney-Patton was not present during the November 2019 robbery, she was able to identify Ray from the surveillance video because of familiarity with him and because Ray was wearing the same clothes as when she encountered him two days prior to the November incident. Further, the jury watched the police interview and heard Ray's confessions to each crime.

Based on the evidence presented by the Commonwealth and viewed in the light most favorable to the Commonwealth, it was not "clearly unreasonable for a jury to find guilt[.]" *Benham,* 816 S.W.2d at 187. Given the sufficiency of the proof considering these standards at the directed verdict stage, the trial court did not err in denying the motion and therefore no palpable error occurred.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Warren Circuit Court.

All sitting. All concur.

18

COUNSEL FOR APPELLANT:

Molly Mattingly
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Stephanie L. McKeehan
Assistant Attorney General